This is for 2012-03-77. You are dated on, may be dated on, versus telling me how to do this, how to do it, and at all. You're going to have to see 50 minutes of time. This is for you. These are for you. Good morning, Your Honors. Good morning. Your Honor, this is our appeal from a decision by the trial court with respect to my client's claim for discrimination. The trial court granted summary judgment in favor of the defendant's appellees and based its reason primarily on their conclusion or its conclusion that there was no showing of an adverse employment action. The reason behind that court decision was that the argument that we put forth about the effects of the new job, the court's conclusion was that it was not material because both job descriptions talked about or advised that the person would be subjected to diesel fumes. However, we put forth to this court and to that court that there were substantial differences  and therefore the court should not have considered the theoretical possibility of exposure as opposed to the actual exposure. What about the, what at least seems an oddity to me, about thinking that when you apply for a job, you get a job, that getting the job is an adverse employment action. That seems like an unusual concept. It's not something I've ever seen. I don't think you've cited a case where that's happened and we haven't found one on our own. Except that there's a distinct difference, Your Honor, and Sixth Circuit case law supports our position, namely that when Mr. De Leon applied for the job a year earlier before he was constructively transferred to the position, he had a predicate demand. In effect, he said, I will take the... A predicate demand? Yes, and we've provided his letter when he submitted his resume. He said, I will take this position and I will expose myself to these conditions but I want a $10,000 salary increase. In addition, he requested an additional man or an additional person to work in that area. Those demands were rejected out of hand. So it wasn't as though Mr. De Leon willingly went to this job. His position was, I would take this job if I was given a $10,000 demand and an additional person. And I think there is Sixth Circuit case law that says when you apply or you agree to move to a lateral position for advancement purposes... You used the word apply. He did apply. Yes, and he was rejected. He was rejected as... Then he applied again. No, he applied once. He applied in August of 2008 and he was rejected as unqualified. Their position was he did not have the requisite computer literacy background to function in this job. But he disagreed, right? He persisted with wanting the job. That's what I'm getting at. No, Your Honor, he did not. Actually, he applied. He was granted a first interview. He did not make the cut for the second interviews and that was it. He kept working as an area superintendent and after they tried five persons in that position and decided that, well, no one wanted that position, it's then, a year later, that they constructively transferred him to that position. By then... When you say constructively transferred, what do you mean by that? You're saying he unwillingly was sent there? Yes. And he said at that point, I know I applied for this job, but I don't want it anymore. That is correct. Where is that in the record where he said, I know I applied for this, but I've changed my mind. I withdraw my application. I don't want this job. I don't know if he said it in those exact terms, but I have cited throughout my brief to various conversations between Mr. DeLeon and the defendants where he... What's the best one? Give me the language of the best conversation for your side. I think where he says, why are you putting me in this job when you know I'm not qualified for this job? And that's his words to Mr. Bartholomew, his direct supervisor, who, by the way, during the initial interview process a year earlier, actually ranked or rated my client with a score of 14 out of 30. He rated him marginal or below minimum standards on every single category of the interview sheet. This conversation you're referring to, that's a conversation that occurs at the time of transfer slash promotion, or that's a conversation that occurs after he's already in the new job? That occurs at the time of transfer, and then there are subsequent conversations while he is in the job. He complained to the human resources person, a Carly Benenson that I cited here, and I cite it to the record. He complained to Mr. Bartholomew. He complained to Joanna Johnson, the managing director, and he complained to a fellow employee. But getting back to the issue of the adverse employment action, Your Honor, in this new position as equipment and facilities superintendent, he's in an enclosed facility. It's a garage, and there are trucks in there There's auto equipment, and they are running constantly because they have to work in there. Wasn't all of that known before he applied for the job? Yes, but remember, there's a distinction. He wanted a $10,000 raise, and I think that's a distinct difference between just wanting the position and wanting the position with a predicated demand. I will expose myself to these conditions, but only if you pay me an additional $10,000 and you give me an additional person. So something becomes an adverse employment action when you seek the promotion, you get the promotion, but it doesn't come with the extra salary you thought you should get. That doesn't seem like an adverse employment action. That seems like not getting the demands you had, which is what happened. I get it, but I don't know why that's an adverse employment action. Well, that's not the adverse employment action. The adverse employment action are the conditions that he's subject to unwillingly, because remember, the court must take into consideration that he was rejected as unqualified for the position. He resigned himself for that decision or that conclusion, and he continued to function in his old position. He no longer wanted the position, but then he was forced to move to that position. The adverse employment action is... You don't have a constructive discharge claim either from this job or the earlier job, right? I mean, that's not part of this case, a constructive discharge claim, is it? I don't know if there's necessarily a constructive discharge claim, but what happens is after he goes on FMLA leave, he's ready to come back to work. They eliminate the position and they terminate him. But getting back to the adverse employment action, our position, Your Honor, is in this new position that he was forced to assume, Mr. De Leon is subject to constant daily exposure of diesel fumes. It's circulated in the circulation system into the offices. He testified, and others have testified, that every week he's got to wipe soot off of the computer screens, off of the office equipment. He is now suffering from bronchitis. He has... Is your theory the case if he'd been given the $10,000 in additional salary, then you would agree this was not an adverse employment action to seek this job and get it, as long as he got the $10,000 extra? I would agree. Then the soot and the diesel fumes go away. The fact that he's not qualified goes away. All of that goes out the window as long as he gets the $10,000 extra in terms of it being an adverse employment action? Well, that's hazard pay. Yes. I mean, if he agrees willingly to take this position to expose himself to those conditions for the additional pay, I would agree, or I would concur, that he wouldn't have an argument with respect to adverse action. Do you have a case for that? A case that says, well, if you apply for a job, but you apply with this, as you said, predicate-fact contingency that, oh, I want this job, but only if it gives this extra salary, that if they promote you, and you go into that job, but they don't give you the extra salary, that makes it an adverse employment action? That would be helpful if there were a case like that. There is no case like that, John, but I think it comes to common sense, because then the individual can't argue adverse action, because they have willingly assumed the position, and they know what they're getting into, because they have demanded extra compensation for the hazards of the job. It's no different than any other job that citizens of this country engage in. There are some positions that, you know, it's called hazard pay, because you're exposed to certain conditions, you demand, or the job demands extra pay, and it's no different here. That was Mr. De Leon's position. I will take this job, because it looks as though no one wants it, but I can maybe work here, advance my career. This is a chance for me to earn extra money, so I will do it for the extra money. They interview him. They say he's not qualified. They move on. They spent a year looking for people for this position. They hired one person who stayed for 18 days, resigned. They offered a job to a second person who also... Do you think they were right when they said he wasn't qualified? They were absolutely right, and I have laid out... Isn't it strange that his theory of the case is that he applied for a job for which he agrees he was not qualified? He wants the job, but only on the condition he gets $10,000 extra, but yet, why should he get $10,000 extra for a job for which he's not qualified? Your Honor, that's not unusual. Sometimes people try to put their hat a little higher than they can reach, and that's not an unusual position or situation, but clearly he was not qualified. With respect to the second argument where he now has to assume extensive technical responsibilities, and it all is predicated on knowledge of computer skills. He has none. When he applied for the job, they told him you don't qualify for this job because you don't have computer skills. A year later, nothing has changed. So putting him into this position is obviously setting him up to fail. He doesn't have any of the computer skills, and that's borne out. He gets into the position, Your Honor, and within months, he's in trouble. It's the first time he's getting negative performance reviews. He doesn't know how to work the computers. He doesn't know anything about any of... I just can't figure this out. Why is the $10,000 so important if you agree he wasn't qualified and if you think they were setting him up to fail? Because if they're setting him up to fail and he's going to leave, as indeed he did, the $10,000 doesn't do you much good because you don't get paid unless you're working. But that goes away. That's not a factor anymore. The $10,000 only distinguishes the fact that he had been willing to assume the job for a $10,000 increase. He didn't get the job. So now, the court has to focus on what happens subsequent to that position. They rejected him as unqualified and they just moved him into the position. The $10,000 is no longer a factor because he never got it and he never got the job based on that demand. I see your red light's on. You'll get your full rebuttal. Thank you, Your Honor. All right. We'll hear from the other side. Mr. Deardarian, is that how it's pronounced? Deardarian. Okay. Good morning, Your Honors. Again, Thomas Deardarian from the law firm of Michael Klocken Associates on behalf of the defendants, the Kalamazoo County Road Commission, Travis Bartholomew, and Joanna Johnson. Opposing counsel has made several assertions to you in his argument I wish to talk about initially. First, he claims that his client made a predicate demand that his accepting the job was conditional upon him getting a $10,000 salary increase and an assistant. That's untrue. He made those demands. According to his testimony and the undisputed facts in this case, a meeting was held on November 18th between Mr. Bartholomew, Ms. Johnson, and the plaintiff, and he made those demands. And Mr. Bartholomew and Ms. Johnson flat out rejected them and told him quite clearly that that wasn't going to happen. He persisted in seeking this job and in fact interviewed six days later on the 24th. So you think the facts are undisputed on this point? Yes. That at the time he was still applying for the job, he was no longer insisting that the application comes with a $10,000 increase? He was told quite emphatically six days before the interview in a meeting he requested. He talked about his ideas for the job. This is according to his testimony. And he was told flat out he never, contrary to what indicated that he did not want the job. He never protested the transfer to the job. He was in the job for 10 months and he never at any time, at any way, made any claim to anyone that he wanted to go back to his old job, that he didn't like the job. Counsel's claims that he protested to Carla Benson, he went and talked to her, he talked to several individuals, but all his discussions were about his problems in dealing with his supervisor, Mr. Bartholomew. The record is completely evident, as Judge Maloney quite accurately wrote in his opinion. The record is completely absent of any claim at any time that the plaintiff ever made any claim whatsoever that he wanted to go back to the old job. He would not accept the job in his position as equipment and facility superintendent. Why isn't transferring an employee to a job the employer knows the employee is not qualified for? Why isn't that an adverse employment action? Well, first of all, Your Honor, this concept that we know he's not qualified is also complete fiction. There is nothing in the record. We have never ever claimed he was not qualified. Joanna Johnson was hired as the new manager of the road commission in 2007, I believe. Michigan's the only state in the country that has road commissions. It's a separate independent government employer from the county. It is run by five commissioners that in this case are appointed and a couple of new commissioners came in. When the vacancy occurred in the equipment and facility superintendent position, the road commission's initial approach was to seek outside the road commission to fill the vacancy. They sought out external applicants. And they interviewed Mr. DeLeon. He applied for the job as an internal applicant. They never told him he wasn't qualified. We have never ever in this case taken the position he was not qualified. We did hire an outside applicant, Mr. Vanderveen. He didn't even make it to the second round of interviews. There were no second round of interviews. He makes this up. There were no second round of interviews. Never happened. How about his scores? Again, we have been claimed that we gave him poor employment evaluations. Again. No, his scores in the interviews. He did very well in the interviews according to Travis Bartholomew. Again, after this was done in a job he didn't want that he was forced into, he sought out management, a meeting with management, why didn't I get the job? And he was told, according to him, Mr. Bartholomew said, your computer skills are weak. And they are. He was not at the top of the list in his computer skills. Right. He needed computer skills for this job. He served as the assistant equipment supervisor from 1988 to 1995. He pretty much did the job for seven years. The road commission was exploring a new computer system to do with its inventory. It is brand new. In looking for external candidates to fill the job, we realized when we were unsuccessful that because the road commission's application is so unique, there are no equivalent experiences in alternate employment outside a road commission. So anyone that we hired, whether external or internal, we were going to have to train. Mr. Van Der Veen, who we hired for the job, again, who was older than Mr. DeLeon, didn't want the job and left after 19 days. We went and looked to offer the job to another external candidate who didn't take it. This claim that we offered it to five people that Mr. Emanuel has claimed is not true. When he turned it down, we decided this isn't working. Let's look at internal candidates. Well, now we had a choice to make. Mr. DeLeon was viewed as the best internal candidate we had. Opposing counsel is suggesting, in fact, claiming, that we should have not given the job to Mr. DeLeon, but instead given it to Mr. DeYoung. So we were supposed to turn down an over-50 Hispanic male who applied and actively sought a job, who we felt was qualified, and instead give it to a white male under 40 who never even applied for the job. Can you imagine the age and racial discrimination case we'd have now? All this claim about the dirty environmental conditions in the garage is, candidly, a fiction. First of all, Mr. DeLeon knew exactly No. The garage There are fumes in the garage. The garage meets all environmental standards. My OSHA has inspected it. Mr. DeLeon worked in that garage for, again, seven years. Other employees work in that garage, including all the mechanics. It certainly, as there are Is your theory there were no there were no difficult effects, conditions, working conditions, or is your theory they existed but he knew about them? My theory is both, but more importantly Where's the record citation that he knew about these conditions? Not only did he know about the conditions from actual working in the garage for years, he held out in the interview I will read the depth transcript, if you'd like, of his testimony. In his interview for the job, one of the reasons he sought the job is because he had ideas about how to recirculate the air in the garage to improve the ventilation. This was an idea he was bringing it was something he was selling in the interview as why he was the best candidate. Furthermore, he worked in that job for ten months after he was transferred to the position. The record is completely absent that he ever, at any time, protested the environmental conditions, complained about them, and any request for improvement assistance, ever. There is nothing in the record that he ever said any of this. In fact, he wanted the job because compared to the job he had as area superintendent, instead of subject to the road hazards of being out in the middle of winter in February at two o'clock in the morning when it's twenty below, I'm in a warm heated garage. He wanted to be in there. If we had given the job to Mr. de Young, opposing counsel would be arguing now, we turned him down. He wanted to be outside, in dangerous conditions, fighting snow and ice. I don't think there's a lot of record evidence for what you're saying right now. The record is clear, sir, that there is absolutely no evidence that he complained about this in any way or any other employee did. There is no evidence there's anything about the environmental conditions in that garage that are not appropriate and up to all standards. What he was getting into when he sought the job, which he held himself out for, is highly qualified. He had worked in that garage for seven years. No, sir. It's all one garage. The office is one little space with the walls blocked off. He worked in that garage. He was the chief of all the inventory situation with the computer, all the parts purchasing, all the equipment maintenance, all the coordination with the mechanics over the scheduling of the maintenance of the fleet. He did that for seven years. He submitted a resume outlining his experience. He was by far the most unqualified internal candidate. This concept that we set him up to fail is candidly illogical and ludicrous. First of all, as the trial court ruled and plaintiff's counsel concedes, he's an at-will employee. You didn't need to set him up to terminate him. You could just terminate him. And candidly, we never really terminated him. He went off on his own.  plaintiff's counsel in this case told him to come back to work. His treating psychiatrist testified the only reason he didn't come back to work was because plaintiff's counsel said it would not help his lawsuit if he did. Everybody recommended to go back to work. Under the road commission's policies, if you stay off work and you don't perform any services for over a year, then your employment is terminated. We waited for a year for him to come back to work. He refused to come back to work. There was no medical in this case saying he was unable to come back to work. All the medical in this case said they recommended he come back to work. The real thrust of your argument is that if you apply for a job and you ultimately get transferred to that job, it can't be an adverse employment action. If it was adverse, why didn't he say something? He worked for us for 26 years. He was a valued member of the management staff. He knows the road commissioners personally. One of the road commissioners came to his house in his home to meet with him and his wife because he was talking about problems he was having in the workplace. He never once said a thing to his wife that he wasn't happy in the new position. He didn't want to go back to being an area superintendent. He just didn't get along with Travis. He says I don't recall. Then he goes on to testify that he's taking three medications and he doesn't recall anything. He testified that he doesn't recall having a discussion with the doctors about whether or not it would affect his memory. I asked him did you ever protest the job? I don't remember. Everyone in this case, if he had gone to Joanna Johnson or Travis Bartholomew or the commissioners and said I want to go back to being an area superintendent, we would have had that discussion. The record is absent of that. He didn't want to do that. This is all created after the fact. There is absolutely no basis whatsoever to claim that he was forced into anything. Where is the record citation that he was the best internal candidate? Joanna Johnson, the person that made the decision, testified that she felt she was the best candidate for the job. Travis Bartholomew testified that he recommended Mr. DeLeon for the job. I thought when he first interviewed for the job,   he thought he was the best candidate for the job. I don't know how many candidates we interviewed. If we interviewed 13, that might be accurate. I don't think that was accurate. There was no separate round of interviews a year later. He was transferred. What we did is we hired Mr. Van Der Veen. He left after 19 days. The time he offered the job, he was the best. That's true. We were going to go outside the road commission, which we don't usually do. Historically, we hire from within. In this case, we initially decided to take a different approach and see if there was an external candidate that more might fit our needs. We were unsuccessful in finding that. So what's your answer to Judge Black's question, he was the best person for the job? You mean that from beginning to end? That seems a little bit implausible given how he responded. When he was given the job, we were down to two choices, whether we give the job to Mr. DeLeon or Mr. Dion. Those are the two people. He was the best person for the job. He was  out of those two. I don't know why you have to be defensive. He was the best out of those two. You decided to go with Mr. Dion. The best person for the job is a little misleading. He was the best person for the job. It's a little misleading when you're down to two. When I say best person for the job, we realized we were going to have to train anyone that we hired in this new software. Whether it was external or internal. Maybe we should have come to that realization earlier. So be it. We decided we will work with Mr. DeLeon and give him the training and invest in him and make him successful. There is nothing in this record whatsoever that indicates we ever claimed he was not being successful. He was not disciplined for his poor performance. I see your red light is on. Thank you very much for your argument. Manuel, you have your rebuttal. Thank you, Your Honor. The great thing about the federal court system is when you make arguments, you must cite a record. I submitted to the court a 38-page brief. I have cited to the record with respect to every single one of my  including Mr. DeLeon's protestations with respect to the job. I have cited to transcripts, I have cited to e-mails. There were second interviews. And for counsel to stand up here and say that is unfathomable. There were second interviews. How about the citations for where he complained about the job? On page 14 of my brief, I cited it and there are other citations. Tell me which deposition is it? Which is his deposition? He says what? He voiced I don't cite the exact words but he voiced his concerns to Johnson about his inability to perform his new duties. With respect to every single argument I made, I have cited to the record. There were second interviews. There were 51 resumes. There were 13 interviews. He did get a 14 score out of a 30 and he got a 19 by Johnson. He was not the best person for the job. Between him and Mr. DeJong, Mr. DeJong had been doing the job for more than a year. Mr. DeJong was the only person Mr. DeJong had a job as a weight master. They moved him from that job. Why is it not appropriate to give the job to the most qualified person? With respect to the internal candidates, Mr. DeJong was the most qualified. He had  the job competently for more than a year. Mr. DeJong complained about the job. The strange way to run a    have the right people to do the job and vice versa. That would be inefficient. As confident as your secretary is, he may not be versed with doing legal research and writing opinions. That would be inefficient. DeJong was doing the job but did not want it. Four people did not want that position. Thank you, Your Honor. We appreciate it. We'll work our way through this case. Thank you, Your Honor.